**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**LINDY-ANN BOURNE**,
　　　an individual,


　　　Plaintiff,


v.　　　　　　　　　　　　　　　　　　　　　　　Hon.
　　　　　　　　　　　　　　　　　　　　　　　　Mag.
**CSIG HOLDING COMPANY, LLC**　　　　Case No.
d/b/a **COMMON SAIL**, a domestic limited liability company;
**SENIOR VILLAGE MANAGEMENT, LLC**, a domestic
limited liability company; and
**SENIOR HOME CARE SOLUTIONS, LLC** d/b/a
**LAURUS HOME CARE**, a domestic limited liability company,


　　　Defendants.

_____/

Nakisha N. Chaney (P65066)
**Salvatore Prescott Porter & Porter,**
**PLLC**
Plaintiff's Counsel
105 E. Main Street
Northville, Michigan 48167
248.679.8711
chaney@sppplaw.com

_____

There are no pending cases involving the
events and occurrences set forth herein.

**<u>COMPLAINT AND JURY DEMAND</u>**

Plaintiff LINDY-ANN BOURNE brings this action for **race discrimination** in violation

of Title VII, 42 U.S.C. § 2000e-2; and Michigan's Elliott-Larsen Civil Rights Act (ELCRA),

M.C.L. § 37.2202; for **retaliation** in violation of Title VII, 42 U.S.C. § 2000e-3; ELCRA, M.C.L.

§ 37.2701; and the Whistleblowers' Protection Act (WPA), M.C.L. § 15.361, *et seq*; and for **tortious destruction, taking and loss of her property**.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Lindy-Ann Bourne is an individual who resides within the Eastern District of Michigan.

2.      Defendant CSIG Holding Company, LLC is a domestic limited liability company doing business as Common Sail (Common Sail) and conducting business in Wayne County, Michigan.

3.      Defendant Senior Village Management, LLC (Senior Village) is a domestic limited liability company conducting business in Wayne County, Michigan.

4.      Defendant Senior Home Care Solutions, LLC is a domestic liability company doing business as Laurus Home Care and conducting business in Wayne County, Michigan.

5.      The events giving rise to this action took place in Plymouth, Wayne County, Michigan.

6.      This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331, as the Court has original jurisdiction of all civil actions arising under the laws of the United States.

7.      This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, as the claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

8.      Venue is in this Court pursuant to 28 U.S.C. § 1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

**MATERIAL ALLEGATIONS**

9.      Plaintiff Lindy-Ann Bourne is a black woman of Trinidadian origin.

10.     On or around October 10, 2022, Defendants hired Plaintiff to work as its Wellness Director at Independence Village of Plymouth (Independence Village) in Wayne County, Michigan.

11.     Independence Village is a residential senior living facility.

12.     Defendants Common Sail, Senior Village and Laurus Home Care are related corporate entities that jointly employed Plaintiff at Independence Village.

13.     Upon information and belief, Common Sail, Senior Village and Laurus Home Care have common ownership and control and are related as parent, subsidiary and/or affiliate companies.

14.     Defendants' Confidentiality, Non-Solicitation and Non-Disclosure Agreement identifies Plaintiff as an "Employee" of Common Sail and its "predecessors, successors, assigns, parents, subsidiaries, affiliates (including affiliated partnerships and joint ventures)," which would include Senior Village and Laurus Home Care.

15.     The written policies, benefits guide, and human resource services provided to Plaintiff were provided by Common Sail and its personnel.

16.     Senior management, to whom Plaintiff reported, reported to Common Sail.

17.     The policies, terms and conditions governing Plaintiff's employment were determined, influenced and/or directed by all three entities.

18.     Common Sail, Senior Village and Laurus Home Care are joint employers for purposes of the claims stated herein.

3

**Plaintiff Was an Excellent Employee**

19. Plaintiff was an excellent employee throughout her tenure.

20. Plaintiff passed all her audits, significantly increased her department's profitability, and was informed that, under her leadership, the site propelled to one of the top three sites in the portfolio.

21. Plaintiff received a pay raise, and she was recognized with a 1440 shout out, a merit award for which she was recommended by the Vice President of Operations to acknowledge her excellence and alignment with the companies' stated principles and values.

22. Plaintiff received gifts after being acknowledged for meeting and surpassing 1440 expectations, and the Chief Executive Officer and executive leadership acknowledged Plaintiff for being the first, or one of the first, Directors to eliminate reliance on an outside agency within the portfolio of companies as it emerged from Covid.

23. Plaintiff never had any corrective actions, performance improvement plans, or negative performance evaluations during her tenure.

24. Plaintiff was excellent on all metrics.

**Plaintiff Experienced, Observed and Reported Racial Discrimination**

25. Throughout her tenure, Plaintiff observed and experienced frequent racially offensive comments and disparate treatment.

26. Plaintiff reported her concerns about racial discrimination, and those of staff members, to the Vice President of Operations and the Regional Wellness Director in January 2023. She also gathered staff members names and contact information as part of the investigation.

27. The conduct continued thereafter unabated.

28. White residents referred to black staff members as "nigger."

29. Senior staff members knew about the slurs, dismissed complaints by black staff about them, and encouraged black staff members to excuse or ignore the slurs.

30. The use of this slur by residents to refer to black staff was an ongoing issue that Plaintiff reported to the Executive Director in or around June 2023, to other Directors in or around June 2023, and to the Regional Wellness Director in or around July or August 2023.

31. The Executive Director and Regional Wellness Director, both of whom are white, dismissed Plaintiff's concerns and excused the residents' use of the racial slur.

32. However, when one of the residents who was permitted to slur black staff members verbally abused the Executive Director by cursing at her, the resident was promptly removed from the facility.

33. The Regional Operations Specialist, who is white, openly made racially offensive comments to black employees, including Plaintiff.

34. For example, in October 2023, the Regional Operations Specialist told Plaintiff that she should dress up like a monkey for Halloween.

35. Also in 2023, the Regional Operations Specialist, among other things:

    a. told black staff members that they reminded her of black staff members at the Lansing facility, who were, as she described it, being loud while fighting over fried chicken and proceeded to ask them if they wanted fried chicken;

    b. said black staff at the Lansing facility had a victim mentality and complained about their participation in Black Lives Matter;

    c. asked Plaintiff if she thought she was treated differently based on what type of black person she was given her national origin (Trinidadian);

d.   made multiple comments to Plaintiff, and upon information and belief to others, that she wanted brown babies;

e.   stated to Plaintiff that she did not have white privilege because she grew up poor; and

f.   informed Plaintiff that her dad called his black friends "colored."

36.   In addition to the racial disparagements, Plaintiff observed, among other things, that black staff members are accused of misconduct they did not commit, subjected to restrictions not applied to others, and that predominantly black staff members at the Plymouth location are, upon information and belief, paid less than predominantly white staff members at a sister facility.

**Plaintiff Reported a Suspected Crime to Police**

37.   On or around August 29, 2023, Plaintiff reported to the Regional Wellness Director, Vice President of Operations, and Human Resources Representative that another staff member threatened to shoot Plaintiff in the mouth.

38.   Plaintiff reported the threat, which Plaintiff regarded as a crime, to the police in September 2023.

39.   Upon learning of the police report, the Regional Wellness Director expressed displeasure with Plaintiff's involvement of the police.

40.   Following an internal investigation, the threatening staff member was, upon information and belief, transferred to a different facility.

41.   A week later, the Regional Wellness Director asked Plaintiff if she (Plaintiff) planned to stay at the company.

**Defendants' Leadership Retaliated Against Plaintiff for Making Protected Complaints**

42. Plaintiff's work environment began to deteriorate after she reported and opposed racial discrimination. It continued and escalated after she made the police report.

43. After making protected complaints of discrimination and a suspected crime, Plaintiff's performance was increasingly scrutinized. She was denied privilege that she was previously granted, and she was treated differently than other employees as to her PTO use.

44. In early December 2023, the Regional Operations Specialist and Regional Wellness Director told Plaintiff that she had to complete a backlog of work that was not within Plaintiff's usual scope of duties and was assigned to the Regional Operations Specialist's responsibility who was the interim Assistant Wellness Director until the position could be filled. That responsibility was assigned to the Assistant Wellness Director. Plaintiff and the Regional Wellness Director previously met and agreed upon the roles of the Assistant Director.

45. In response to Plaintiff's objection that it was not fair that they were requiring her to do the work, the Regional Operations Specialist brought up the fact that the employee who threatened Plaintiff was no longer at the facility. Notably, the threatening employee had nothing to do with the work with which Plaintiff was being saddled, and her departure was not relevant to Plaintiff's scope of work.

46. The Regional Wellness Director's and Regional Operations Specialist's effort to assign Plaintiff this additional work was retaliatory, and their reference to the threatening employee's departure evidenced their upset that Plaintiff filed a police report resulting in her removal from the facility.

**Defendants Terminated Plaintiff**

47. On December 11, 2023, Defendants terminated Plaintiff.

7

48.     Plaintiff's termination was the culmination of, and was related to, the retaliation that began after she complained about and opposed racial discrimination and continued after she made a police report of suspected criminal activity.

49.     Prior to her termination, Plaintiff did not have any corrective actions, negative performance evaluations or performance improvement plans.

50.     Defendants did not employ lesser corrective actions that were available to them, demonstrating their intent to terminate.

51.     Plaintiff was treated differently than at least one similarly situated white leader in that she was immediately terminated without any prior corrective actions or performance improvement plan or notice.  Upon information and belief, the similarly-situated white leader, among other things, had previous performance issues, was given notice of the termination, was allowed to continue working after notice of the termination and was given a severance or other payment.

52.     Moreover, Defendants' stated reasons for termination (failing to set up the new Wellness Coordinator for success and poor communication) were false, pretextual, unsubstantiated, and inconsistent with Plaintiff's demonstrated achievements.

53.     The actual reason Defendants terminated Plaintiff was that she opposed unlawful conduct in the workplace, and she would not turn a blind eye to such conduct, whether it violated civil rights or the criminal code.

54.     The retaliatory animus motivating Plaintiff's termination also is evident in the manner it was handled.

55.     Plaintiff was immediately terminated. She was not permitted to retrieve her personal property. Instead, she was told that her property would be boxed up for her and made available for pick up.

56.     When Plaintiff picked up her items, the Regional Operations Specialist told Plaintiff that the Regional Wellness Director packed her items.

57.     Defendants did not return all of Plaintiff's property. There were multiple missing items, including an Alexa device, an orchid, a flower arrangement, and a heart-shaped paper craft and personal note that Plaintiff's daughter made for her.

58.     The Regional Wellness Director was aware of the significance of Plaintiff's daughter's note to her, as Plaintiff previously shared it with the Regional Wellness Director in a text exchange.

59.     On December 15, 2023, the Human Resources Director told Plaintiff that her daughter's craft and note, and Plaintiff's plants, were "discarded."

60.     Plaintiff's other property remains missing or at the facility.

61.     As a result of Defendants' actions, Plaintiff has, and continues to suffer, significant harm, including financial loss, harm to her mental health, the fear and angst that attends job loss and financial insecurity, upset, and frustration.

**Plaintiff Timely Brings Suit**

62.     Plaintiff filed charges with the Equal Employment Opportunity Commission against Defendants for race discrimination and retaliation on January 4 and 5, 2024, as reflected in Charges No. 471-2024-01863, 471-2024-01862, and 471-2024-01863.

63.     On February 19, 2024, the Parties entered into a Tolling Agreement, which expires April 30, 2024.

64.     The EEOC issued Plaintiff Right to Sue notices on March 29, 2024.

65.     Plaintiff now timely brings suit for violations of Title VII, ELCRA and the Whistleblower Protection Act.

**COUNT I**
**Race Discrimination**
**Title VII, 42 U.S.C. § 2000e-2**

66.     Plaintiff incorporates here all previously stated allegations.

67.     Plaintiff, a black woman, is a member of a protected class.

68.     Defendants have more than 15 employees. They are "employers" within the meaning of Title VII.

69.     Defendants maintained and allowed a racially hostile work environment with severe and pervasive offensive racial comments and conduct that was motivated by racial animus and/or bias.

70.     Defendants, through their senior leadership and human resources department, knew or should have known about the racially hostile environment.

71.     The racial harassment Plaintiff experienced and observed affected the conditions of her employment and created an intimidating, hostile, and offensive work environment.

72.     Plaintiff was, at all times, qualified for her position.

73.     Plaintiff was treated differently than one or more similarly-situated employees outside her protected class with regard to the manner and conditions of her termination.

74.     Plaintiff's different treatment was, in part and upon information and belief, the result of racially discriminatory animus or bias.

75.     In so acting, Defendants acted with malice or reckless indifference toward Plaintiff's federally protected rights and its senior leadership, in permitting and committing discrimination, operated in a managerial capacity and within the scope of their employment.

## COUNT II
### Race Discrimination
### Elliott-Larsen Civil Rights Act, M.C.L. § 37.2202

76.     Plaintiff incorporates here all previously stated allegations.

77.     Plaintiff is a member of a protected class.

78.     Plaintiff observed, experienced, and reported unwelcome, offensive race-based conduct and comments.

79.     Both were severe and/or pervasive such that they affected the conditions of her employment and created an intimidating, hostile, and offensive work environment.

80.     Defendants knew or should have known about the environment and conduct but failed to take any corrective or preventive actions.

## COUNT III
### Retaliation
### Title VII, 42 U.S.C. § 2000e-3

81.     Plaintiff incorporates here all previously stated allegations.

82.     Plaintiff engaged in protected activity when she reported and opposed race discrimination, including when she reported discrimination to the Executive Director, Regional Wellness Director, other Directors, and the Vice President of Operations. Plaintiff also engaged in protected activity when she participated in the investigation after her report in January 2023.

83.     Defendants, with knowledge of Plaintiff's protected activity, took adverse actions against Plaintiff, including increased scrutiny, termination, and the destruction, taking and/or loss of Plaintiff's property, because of Plaintiff's protected activity and with retaliatory animus.

**COUNT IV**
**Retaliation**
**Elliott-Larsen Civil Rights Act, M.C.L. § 37.2701**

84.     Plaintiff incorporates here all previously stated allegations.

85.     Plaintiff engaged in protected activity when she reported and opposed race discrimination and participated in investigations or inquiries.

86.     Defendants, through their senior leadership, were aware of Plaintiff's protected activity.

87.     Defendants took actions that were materially adverse to Plaintiff, including but not limited to, termination and destruction and loss of Plaintiff's property.

88.     These actions were taken with retaliatory animus and because of her protected activity.

**COUNT V**
**Whistleblowers' Protection Act**
**M.C.L. § 15.361, *et seq.***

89.     Plaintiff incorporates here all previously stated allegations.

90.     Plaintiff was an "employee" within the meaning of M.C.L § 15.361(a) because Plaintiff performed a service for wages or other remuneration under a contract of hire, written or oral, express or implied.

91.     Defendants were her "employers" within the meaning of M.C.L. § 15.361(b).

92.     The police to whom Plaintiff reported the actual or suspected violation of the law is a "public body" as defined in M.C.L. § 15.361(d)(v).

93.     Plaintiff engaged in protected activity under M.C.L. § 15.362 when she reported an actual or suspected violation of the law to a public body.

94.     Defendants, with knowledge of Plaintiff's protected activity, terminated Plaintiff because of Plaintiff's protected activity in violation of M.C.L. § 15.362.

95.     In so acting, Defendants' conduct was malicious or so willful and wanton as to demonstrate a reckless disregard of Plaintiff's rights.

## COUNT VI
## Tortious Destruction and Taking of Personal Property

96.     Plaintiff incorporates here all previously stated allegations.

97.     The Alexa device, orchids, flowers, and paper craft and note (the "Property") belong to the Plaintiff and only Plaintiff.

98.     Neither Defendants nor their agents have or had an ownership or possessory interest in the Property.

99.     Following Plaintiff's termination, Defendants denied Plaintiff access to the Property, and then, through their agent(s), intentionally discarded and caused the loss of that Property.

100.    In so doing, Defendants acted not only negligently but willfully, with retaliatory animus and in reckless disregard of Plaintiff's rights.

101.    As a result, Plaintiff lost property that had financial and significant sentimental value to her, causing her economic harm, upset and frustration.

## RELIEF REQUESTED

Plaintiff seeks all available and appropriate compensatory and equitable relief, including:

1.     lost wages and all other financial losses;

2.     compensatory damages for noneconomic harm;

3.     compensatory damages for property destruction, taking and loss;

4.     punitive and exemplary damages; and

13

5.      attorney fees and litigation costs.

Submitted,
SALVATORE PRESCOTT
PORTER & PORTER PLLC

/s/ Nakisha N. Chaney
Nakisha N. Chaney (P65066)
105 E. Main Street
Northville, Michigan 48167
248.679.8711
chaney@sppplaw.com

Date: April 17, 2024

14

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**LINDY-ANN BOURNE**,
an individual,

Plaintiff,

v.                                                              Hon.
                                                               Mag.
**CSIG HOLDING COMPANY, LLC**         Case No.
d/b/a **COMMON SAIL**, a domestic limited liability company;
**SENIOR VILLAGE MANAGEMENT, LLC**, a domestic
limited liability company; and
**SENIOR HOME CARE SOLUTIONS, LLC** d/b/a
**LAURUS HOME CARE**, a domestic limited liability company,

Defendants.

_____/

Nakisha N. Chaney (P65066)
**Salvatore Prescott Porter & Porter,**
**PLLC**
Plaintiff's Counsel
105 E. Main Street
Northville, Michigan 48167
248.679.8711
chaney@sppplaw.com

_____

## JURY DEMAND

Plaintiff demands a trial by jury in the above-captioned matter.

Submitted,
SALVATORE PRESCOTT
PORTER & PORTER PLLC


/s/ Nakisha N. Chaney_____
Date: April 17, 2024              Nakisha N. Chaney (P65066)


15